UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| JOHN J. FRAZER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:24-CV-177-REW-CJS |
| | ) | |
| V. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | OPINION & ORDER |
| | ) | |
| Defendant. | ) | |

*and*

| | | |
|---|---|---|
| JOHN J. FRAZER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:23-CV-193-REW-CJS |
| | ) | |
| V. | ) | |
| | ) | |
| P. MULLINS, *et al.*, | ) | OPINION & ORDER |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This is a consolidated case. Plaintiff John Frazer filed two motions seeking judgment in

his favor. In the first, he seeks summary judgment against eleven defendants on his claims asserted

pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 91 S. Ct. 1999

(1971). *See* DE 26 (Motion for Summary Judgment). In the second, Frazer seeks summary

judgment against the United States on his claim asserted pursuant to the Federal Tort Claims Act

("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq*. *See* DE 32 (Motion for Summary Judgment).

Defendants responded to each motion. *See* DE 34 (Response to Motion for Summary Judgment

on FTCA Claims); DE 36 (Response to Motion for Summary Judgment on *Bivens* Claims). There

was no reply. The defense also filed a cross-motion seeking summary judgment on both of

Frazer's claims.  *See* DE 33 (Defendants' Motion for Summary Judgment).  Frazer responded, *see* DE 40 (Plaintiff's Response to Defendants' Motion for Summary Judgment), to which Defendants have replied, *see* DE 41 (Defendants' Reply).  All of the motions are fully briefed and ripe for review.[1]

## I.    Factual Background

Frazer is currently confined at the Federal Medical Center in Lexington, Kentucky.  *See* DE 33 at 2.  Frazer has an extensive medical history dating back to his childhood, which includes "hypertension, anemia, renal osteodystrophy, heart failure with preserved ejection fraction, coronary artery disease with a history of percutaneous stent placements in the past[,] type 2 diabetes mellitus[,] chronic pancreatitis, SVC obstruction hyperlipidemia, depression and anxiety." *See* DE 33-1 at 2 (Progress Notes); *see also* DE 33-5[2] (March 17, 2025, Expert Report of Dr. Paul Fitzgerald) at 3-4.  Medical records from 2024 list nearly two dozen medications Frazer takes at varying intervals.[3]  *See* DE 33-1 at 4-6 (Current Outpatient Medications).

From 2014 until 2022, Frazer was incarcerated at the Federal Medical Center in Rochester, Minnesota.  *See* DE 33-2 (Frazer Deposition) at 8.  Because of his chronic pancreatitis, Frazer's

---

[1] Frazer filed his separate *Bivens* complaint in June 2023.  *See Frazer v. Mullins et al.*, No. 5:23-CV-193-REW-CJS (E.D. Ky. 2023), DE 1 (Complaint).  He filed his FTCA complaint in this action in July 2024.  *See Frazer v. United States*, No. 5:24-CV-177-REW-CJS (E.D. Ky. 2024), DE 1 (Complaint).  The two cases were administratively consolidated in April 2025, with this case designated as the lead action.  *See* DE 25 (Order).  Unless otherwise indicated, all references to docket entries shall be to those found in the lead action.

[2] The Court denied Frazer's motion to exclude any expert testimony by Dr. Fitzgerald.  *See* DE 44 (Order); DE 27 (Motion to Exclude).  Frazer did not renew this objection in his summary judgment briefings.  Regardless, as evident in the analysis below, the Court's references to Dr. Fitzgerald's report would not be subject to exclusion and was not, itself, dispositive.

[3] The Bureau of Prisons ("BOP") maintains medical records in an electronic database, the Bureau Electronic Medical Record ("BEMR").  *See* DE 33-3 (Hobbs Decl.) at 3 ¶ 4.  Within the BEMR, healthcare providers input information into the Medication Administration Record ("MAR") detailing what medications are administered, by whom, and at what time and dose.  *See id*. at 3 ¶ 5.

pancreas "still produces insulin, but it's sporadic. It's, it can kind of shoot-out insulin whenever it decides it wants to, it seems like, which is why I'm kind of sensitive to insulin." *See id*. at 18-19. It was not until 2016 or 2017 that Frazer was first diagnosed with diabetes, and he was prescribed insulin shortly thereafter. *See id*. at 20-21. After some trial and error, physicians working on behalf of the BOP placed Frazer on a "sliding scale" insulin dosage based upon his blood glucose readings for a given point in the day.[4] *See* DE 33-2 at 23. Under the sliding scale approach, Frazer receives between one and five units of insulin depending upon his most recent blood glucose reading, with higher doses administered as his blood glucose readings elevate. *See id*. at 23, 32. Specifically, Frazer's sliding scale prescription for insulin directed healthcare staff to "[i]nject subcutaneously twice daily per sliding scale: BG [blood glucose, presumably] 150-199 = 1 unit; 200-249 = 2 units, 250-299 = 3 units, 300-349 = 4 units, 350-399 = 5 units, 400 or higher = 5 units & contact provider." *See* DE 33-4 at 11 (cleaned up). Nonetheless, while at FMC-Rochester, Frazer felt that his diabetes was not well controlled because his daily blood glucose levels fluctuated widely. *See* DE 33-2 at 24.

When Frazer transferred to FMC-Lexington in 2022, his diabetes prescription remained unchanged and used the same sliding scale. *See* DE 33-2 at 24, 32-34. Although Frazer's prescription directs that he receive insulin in the morning, he testified that he chooses not to take that dose because he does not eat breakfast. *See id*. at 27. Instead, Frazer first uses his glucometer to take a reading of his blood sugar shortly before he has lunch. *See id*. at 27-28. Just after lunch,

---

[4] *See also* DE 33-3 (Declaration of Jacquelyn Hobbs) at 2 ¶ 2 ("Insulin glargine is a long-acting insulin injected once daily and provides a basal insulin level throughout the day. Sliding scale insulin involves the administration of an increasing dose of insulin based on the inmates [sic] self-reported blood sugar levels and is administered three times daily. Inmates are responsible for checking their blood sugar level just prior to insulin line and reporting the blood sugar level to the member of the nursing staff who is administering the insulin.").

Frazer proceeds to the insulin line at the health department and reports his blood sugar level to a nurse.[5]  Depending on what he ate for lunch, Frazer then decides whether or not he wants to receive an insulin injection from the nurse for the afternoon.[6]  *See id.* at 28-31.

Frazer tests his blood sugar again at around 4 p.m. and reports it to the nurse, who administers insulin according to the sliding scale.  *See id.* at 31-34.  Independent of the sliding scale insulin, the nurse would also inject the slow-acting glargine insulin.  *See id.* at 34; *see, e.g.*, DE 33-4 at 12, 14, 17.  If Frazer started experiencing low blood sugar in the evening, he would swallow a glucose tablet or eat a snack with high carbohydrates.  *See* DE 33-2 at 39, 42.  Frazer kept a substantial stockpile of snacks that he had purchased from the commissary for this purpose. *See id.* at 49-50.

In March 2023, Frazer obtained a copy of his MAR.  Frazer testified that those records showed that nurses had frequently administered the highest dose - five units of insulin - without regard to the blood glucose number that he reported to them.[7]  *See* DE 33-2 at 34, 36.  Indeed, on the days where Frazer showed up at the evening pill line and requested insulin, most of the MAR entries show five units were administered.  *See generally* DE 1-2.  On days indicating the

---

[5] *See* DE 33-3 at 2 ¶ 2 ("During insulin line, which is conducted three times daily, inmates report to the institution's central clinic where insulin is administered through subcutaneous injection.").  Frazer's self-reported blood glucose numbers are recorded in the "Comments" section of the MAR.  *See, e.g.*, DE 1-2 at 3, 6; DE 26 at 7.

[6] Consistent with his deposition testimony, the MAR shows that Frazer was a consistent "No Show" for the morning insulin line.  The MAR also reveals nearly one hundred instances over an eleven-month span where Frazer was either a "No Show" for the afternoon or evening insulin lines or was present but refused any sliding scale insulin injection notwithstanding elevated blood glucose levels.  *See* DE 1-2 (MAR) at 2-37.

[7] The medical records indicate that "0.05" of insulin was administered on most days.  *See* DE 33-4 at 11, 14, 17, 19, 21, 24, 26.  That number represents five "units" of insulin: "[i]n the MAR for insulin employed at Lexington FMC, insulin doses are expressed in milliliters (mL), rather than units.  The standard insulin concentration is 'U100', meaning that there are 100 units per mL.  Thus, the '0.02' refers to 2 units and '0.05' refers to 5 units."  *See* DE 33-5 (Fitzgerald Report) at 7 ¶ 3.

administration of some other dose, usually only one or two units of insulin were administered. *See* DE 1-2 at 4, 7, 9, 11, 14, 16, 18, 20, 24, 30, 35. Shortly thereafter Frazer met with a physician's assistant to express his concern, but after another meeting with the Assistant Health Services Administrator, he was kept on the same sliding scale prescription. *See id*. at 35.

Frazer testified in his deposition that he now believes that on each of the dates and times he reviewed, the nurses did in fact administer the five units of insulin to him as shown in the records. *See id*. at 36-37. In other words, Frazer testified that the medical records accurately reflect the insulin dose that he was given for each visit. Frazer persisted in that position after being reminded that in his 2023 *Bivens* complaint he alleged that the nurses had falsified his medical records in this regard:

> **Q.    Okay. So, were you being given five milligrams? or were you being given something less and the record might just show five milligrams? or do you know?**
>
> A.    Well, I, I believe based on the record, that I was getting five units of insulin.
>
> **Q.    Okay.**
>
> A.    So, I guess the false …
>
> **Q.    Go ahead.**
>
> A.    … that would, well, that would negate the falsification of the record, I guess, would it not? If that's what the record shows?
>
> **Q.    I'm asking what you think.**
>
> A.    Well, based, based on that I kept going low during those times. I would, I would say that the record is correct.

DE 33-2 at 37.

On average, "100 to 150 inmates will report to insulin line" each day. *See* DE 33-3 (Hobbs Decl.) at 3 ¶ 6. After each inmate receives his or her insulin injection, the nurse will make an entry

into the MAR. *See id.* However, two of the BOP nurses who administer insulin at FMC-Lexington

testified by declaration that:

> The BEMR user interface in the MAR auto populates the dosage of insulin to the highest dose possible. In Plaintiff's case, the highest dose in his sliding scale insulin prescription was for 0.05 units of insulin. [See Attachment B: USA-000001 to USA-000023.] Unless the dosage amount is manually changed before the record is entered, it will reflect in the MAR that the highest dose was administered. Given the volume of inmates present during insulin line and the time constraints on processing all inmates through the insulin line, I did not always adjust the dose in the MAR to reflect the actual dose provided after administering the insulin. While the MAR does not reflect it, I always administered the correct amount of insulin based on the blood sugar level reported by Plaintiff.

DE 33-3 at 3 ¶ 6; *see also* DE 33-4 (Declaration of Amanda Miller) at 4 ¶ 6 (same).[8]

Frazer indicates that sometimes when he checked his blood sugar in the early evening it

would read 60 or 70, below the 80-85 threshold at which he would begin to experience symptoms

---

[8] In his Expert Report, Dr. Fitzgerald states that "[t]he entry '0.5' [actually, '0.05'] appears frequently in the EMR-populated MAR. According to the directors of nursing at Lexington FMC, that specific entry means that a sliding scale amount of insulin was administered." *See* DE 33-5 at 8 ¶ 3. Standing alone, that explanation is inconsistent with the quoted declarations, which indicate that the auto-populated value is intended to be manually adjusted to reflect the number of insulin units actually administered. Dr. Fitzgerald later clarifies that the nurse "administering the insulin would need to change the entry in order to record the dose; that was done only intermittently …" *See id.*

Assuming for purposes of discussion that the nurses' explanation is correct, entries in the MAR demonstrate that such corrections occurred only sporadically. For example, in some cases the MAR shows that one or two units of insulin was administered, an amount which properly corresponded to the sliding scale value appropriate for the blood glucose level reported. *See, e.g.,* DE 1-2 at 4-5 (showing administration of one, two, and one unit of insulin on August 5, 6, and 7, 2022, respectively, adhering to the sliding scale prescription in light of reported blood glucose values of 184, 203, and 184, respectively, on those dates). In contrast, for example, the MAR states that five units were administered on August 10, 2022, a substantially higher dose that the one unit called for under the sliding scale given the reported blood glucose value of 158 on that date. *See id.* at 4, 6.

of hypoglycemia.[9]  *See id*. at 38-39.[10]  Frazer did not identify any specific dates when he experienced significant episodes of hypoglycemia.  He testified that, apart from occasional and temporary symptoms like shaky hands and sweating after such episodes, over time his vision has deteriorated and he sometimes experiences tingling in his fingers.  *See id*. at 38, 44, 46.

In his Report, Dr. Fitzgerald notes that the MAR reflects only a single hypoglycemic episode based on a reported blood glucose level of 49 on the evening of May 17, 2023.  *See* DE 33-5 at 7 ¶ 1.  Fitzgerald acknowledges that this does not foreclose the possibility of other, unreported episodes occurring after the evening insulin line.  However, he notes that Frazer possessed his own glucometer and test strips, so he could have documented such episodes and reported them to the medical staff the following day.  *See id*. at 8.  The medical records do not indicate that he did so, or, importantly, that he ever sought emergency medical aid due to hypoglycemia.  *See id*.

---

[9] In his Expert Report, Dr. Fitzgerald states that "[h]ypoglycemia is present if glucose levels drop below 70 mg/dL.  The brain requires glucose and as the glucose levels drop below 70 mg/dL, the brain has less and less energy, with manifestations ranging from no symptoms (for mild hypoglycemia) to symptoms of increasing fatigue, cognitive deficits, somnolence, or even loss of consciousness (glucose levels below 40 mg/dL)."  *See* DE 33-5 (Fitzgerald Report) at 6.

[10] Frazer's *Bivens* complaint and FTCA complaint assert claims based upon insulin administration between July 2022 and June 2023.  *See* DE 1 therein (*Bivens* complaint) at 3-7; DE 1 (FTCA complaint) at 3-5.  The MAR reflects that during this period, eight of Frazer's blood glucose readings were 85 or below, with the earliest recorded instance in March 2023.  Of these readings, six were reported at lunchtime, one in the early morning, and only one in the early evening.  *See* DE 1-2 (MAR) at 21, 27-28, 32-34, 36-37.  During the same time period, readings between 86-100 were reported 17 times.  *See id.* at 8, 15, 21-22, 27-28, 31-34, 36-37.  At the other, higher end of the spectrum, elevated blood glucose levels of 200 or more were reported 88 times; of 250 or more 37 times; and 300 or more 6 times.  *See id*. at 3, 5-6, 10-13, 15-17, 19, 21-23, 26-29, 31-34, 36-37.

## II.    Legal Claims and Corresponding Dispositive Motions

In his *Bivens* complaint, Frazer alleged that from July 2022 through June 2023 all of the defendant nurses[11] "engaged in a Continuing Civil Conspiracy" to falsify his medical records by recording in them a dose of insulin different from what they actually administered at that visit. *See* Case No. 23-193-REW-CJS, DE 1 at 3-4. Specifically, Frazer claimed that each entry in the MAR indicating that five units of insulin were administered at the evening insulin line was false. *See id.* at 4-8. Likewise, in his inmate grievances Frazer asserted that he "was not being given" the "5 units of Regula[r] Insulin Daily" as shown in the MAR. *See* DE 1-1 therein at 20. He has not made any allegation about what dose of insulin was actually administered. Over the eleven-month period referenced in the *Bivens* complaint, Frazer alleged that the nurses collectively falsified medication entries 223 times. *See* DE 1 therein at 6. He alleged that the defendants' actions caused him to suffer "multiple bouts of Hypoglycemia (low blood sugar)" as a result of injecting too much insulin. *See* DE 1 therein at 4. Frazer contended that "the Defendants ALL violated Plaintiff's Eighth Amendment Right against CRUEL AND UNUSUAL PUNISHMENT, thru Deliberate Indifference, by falsifying the Official Medical Record of the Plaintiff …" *See id.* at 3-4.[12] He seeks $20 million in damages. *See id.* at 15.

Frazer's FTCA complaint inverts the narrative from that of his *Bivens* complaint, alleging instead that his medical records are in fact accurate. *See* DE 1 at 8-9 (alleging that the nurses "inject[ed] the plaintiff with 5 units of Regular insulin when the doctor's orders listed clearly show the proper amount to be given for certain blood glucose readings …"); *see also* DE 1-1 at 2 (Form

---

[11] Frazer originally sued twelve nurses, but later voluntarily dismissed his claims against defendant P. Marrs. *See* Case No. 23-193, DE 70 (Motion to Amend Complaint), DE 73 (Order); DE 77 (Order).

[12] In Case No. 23-193, the Court previously dismissed Frazer's claims under certain criminal statutes and the Americans with Disabilities Act. *See* DE 47 therein at 2-4 (Memorandum Opinion and Order).

SF-95, *Claim for Damage, Injury, or Death*, wherein Frazer states that the nurses "have been giving Frazer 5 Units of Regular Insulin almost daily …").  In his FTCA complaint, Frazer alleges the nurses were negligent under Kentucky law[13] by frequently injecting five units of insulin, more than that called for by his doctor's sliding scale prescription.  *See* DE 1 at 3 (alleging that he "was injected by the [nurses] with an Overdose of Insulin through medical negligence[.]").  As noted just above, that assertion directly contradicts Frazer's allegation in his prison grievances that the nurses "falsif[ied] the Official Medical Record, to show that Frazer was being Injected with 5 units of Regula[r] Insulin Daily, when in Material Fact Frazer was not being given that amount …"  *See* Case No. 23-193-REW-CJS, DE 1-1 therein at 20.  In his FTCA complaint, however, Frazer claims that the nurses acted negligently by failing to administer the dose prescribed by his physician.  *See* DE 1 at 6.  He seeks $20 million in damages.  *See id*. at 10.

In his separate motions seeking summary judgment on his *Bivens* and FTCA claims, Frazer adopts exclusively the narrative of the FTCA complaint: that the nurses repeatedly injected five units of insulin in disregard of the incremental dose called for under the sliding scale prescription, properly metered by his reported blood glucose levels.[14]  *See* DE 26 (*Bivens* Motion) at 10 ("So

---

[13] In his FTCA complaint and corresponding dispositive motion, Frazer includes brief references to 18 U.S.C. § 4042, which establishes the BOP's general duty to provide for the safety, security, and care of inmates under its charge.  *See* DE 1 at 9; DE 32 at 4.  However, Frazer does not indicate that he asserts a negligence *per se* claim based upon an asserted violation of that statute.  *Cf. Bunche v. United States*, No. 17-6190, 2018 WL 4959029 (6th Cir. June 20, 2018).  Instead, he references often and at length Kentucky negligence and malpractice law as the source of his claim.  *See* DE 1 at 6-9 ("Thus if a federal employee's conduct in Kentucky would render him or her liable for negligence under Kentucky law, the United States may be held accountable in tort under the FTCA."); DE 32 (FTCA motion) at 4 ("Pursuant to the [FTCA], … the substantive tort law selected was the tort law of the state where the claims act or omission occurred. 28 U.S.C. § 1346(b). The alleged acts occurred while Frazer was in detention at the FMC Lexington, KY facility, therefore, Kentucky law is applicable to the matter before the court.").  The defense treats Frazer's FTCA claim in this manner in their briefing.  *See* DE 34 at 3 ("Frazer has not made a claim for negligence per se.").  Frazer did not object to that assertion.  The Court evaluates his negligence claims accordingly.

[14] Despite Frazer's reversal of this factual allegation, and his inconsistent claims that the nurses' conduct amounted to negligence on the one hand and deliberate indifference on the other, the defendants do not invoke any form of estoppel to constrain his opposing contentions.

CLEARLY when the MAR shows that 0.05 units of Insulin was given to the plaintiff on each day in question means 5 Units of Insulin was given that day and can mean nothing else, by there (*sic*) own admission."); DE 32 (FTCA Motion) at 6 ("Defendants admitted that they deviated from the doctors Prescribed order for Insulin …"), 11 (stating that the defendants "knew that they were to contact the prescribing doctor when administering 5 or more units of insulin according to the order for insulin but did not.").

Frazer also assails the nurses' assertion that the MAR contains inaccuracies caused by auto-populated dose values that were not manually corrected. Frazer first characterizes as "absolutely preposterous" the nurses' statement that the MAR auto-populates the maximum dosage under the sliding scale, *see* DE 26 (*Bivens* Motion) at 9, and insists that the MAR "is a 'RECORD OF MEDICATION ADMINISTERED' and as such is a Permanent Record of what was done on what day to who and by who and the amount given. It can be no other way." *See id*; *see also id.* at 7 (asserting that "the Medication Administration Record (MAR) … [is] a direct record of the defendants action in this case.").

The defendants begin their motion for summary judgment on both claims by noting points upon which the parties agree: that the MAR states that Frazer was given five units of insulin many times (more than 200, by Frazer's count) from July 2022 to June 2023, and that his reported blood glucose level was never high enough to warrant that dose under the sliding scale prescription. *See* DE 33 at 4. They also identify a central point of disagreement: while Frazer ultimately contends that "the twelve nurses actually administered five units of insulin to him every time the MAR says they did[,]" the (two) nurses explain that the MAR auto-populates the maximum dose and that "they often did not adjust the MAR to reflect the actual dosage of insulin given." *See id*. In sum, the competing factual narratives presented by the parties pivot around a central axis: Were the

records correct and the doses incorrect, or were the records incorrect and the doses correct? Regardless, the defendants argue that the "dispute is not material because Frazer has failed to show that the alleged overdoses proximately caused him any injury." *See* DE 33 at 4-5.

With respect to the FTCA claim, Frazer has not provided the expert opinion required by Kentucky law to support a claim of medical negligence, and the United States argues that the doctrine of *res ipsa loquitur* does not apply to excuse that failure. *See* DE 33 at 5-7. The government notes that some of Frazer's reported symptoms are typical for diabetics, not merely those experiencing hypoglycemia; Frazer's own noncompliance with his insulin regimen was likely partially responsible for difficulties in managing his diabetes; that there is little evidence that he suffered hypoglycemic episodes; and that such episodes are not atypical even with proper blood sugar management in patients like Frazer with pancreatic diabetes. *See* DE 33 at 7-9. The government implies that such facts take the competent medical management of diabetes outside of the range of matters that a jury may decide without the assistance of an expert's opinion. *See id.* at 9.

Challenging Frazer's *Bivens* claim, the defendants note that in his FTCA complaint, Frazer contends that his claimed injuries "resulted from the *negligence* of the [nurses]," *see* DE 1 at 2 (emphasis added), not because they acted recklessly or maliciously with respect to his medical care, and that he points to no evidence of the latter. *See* DE 33 at 10-11. They further note the statutory judgment bar found in 28 U.S.C. § 2676 will bar a *Bivens* claim if judgment is entered against the complainant on his FTCA claim. *See id.* at 11-12. Finally, the nurses contend, also in the *Bivens* context, that Frazer must provide expert testimony to "establish that the incorrect doses of insulin he allegedly received caused him any harm." *See id.* at 12.

11

The parties' responses and replies largely renew the positions taken in their respective motions. The defendants contend that Frazer is not entitled to summary judgment on either his FTCA or *Bivens* claims because the nurses' declarations create a factual issue regarding whether the MAR accurately reflects the dose of insulin that was administered. *See* DE 34 at 1, 3-4; DE 36 at 2-4. For his part, Frazer asserts that he is (and the defendants are not) entitled to judgment because the MAR is conclusive of what happened. *See* DE 40 (Response) at 1 ("Clearly the RECORD of what happened shows what actually happened."). The defendants further argue that despite a factual question on the issue of whether a duty of care was breached, for both his FTCA and *Bivens* claims, Frazer must provide expert testimony to establish causation and resulting harm. *See* DE 34 at 5-6; DE 36 at 4; DE 41 at 1-2. Frazer, invoking the doctrine of *res ipsa loquitur*, counters that a jury is competent to decide the question unaided by expertise. *See* DE 40 at 2-3.

### III. Governing Standards

The Court must grant summary judgment to a requesting party if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). The party seeking summary judgment must first demonstrate that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986). If that burden is met, to avoid summary judgment the nonmoving party must then produce "specific facts" showing a "genuine issue" for trial. *Celotex*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). Under this framework the nonmovant "must do more than simply show that there is

12

some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986).[15]

To determine whether a genuine factual dispute exists, the Court asks whether "a reasonable jury could return a verdict for the nonmoving party." *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020) (citation omitted). When answering that question, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Id.* (*quoting Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013)). Additionally, at the summary judgment stage, the Court may not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986). However, if the responding party's allegations are so clearly contradicted by the record that no reasonable jury could adopt them, the court need not accept them when determining whether summary judgment is warranted. *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). Ultimately, "Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 106 S. Ct. at 2552.

Rule 56 does not require that the evidence considered, at the summary judgment stage, then be admissible. Obviously, Rule 56(c)(1)(A) references a host of materials, "in the record," that may form the decisional basis. For this reason, many such items might present proof that would not, in the instant form, make it into the trial record. Thus, an affidavit must be "made on personal knowledge [and] set out facts that would be admissible in evidence[.]" *See id.* at (c)(4). "[T]he

---

[15] A party's *pro se* status does not lessen his obligation at this stage, procedurally or substantively. A party cannot rely on unsworn allegations or denials to oppose a dispositive motion, and a party's "status as a *pro se* litigant does not alter his duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010).

party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Id*. Further, courts, "in determining whether to consider hearsay evidence, may inquire as to whether the party opposing summary judgment is capable of producing an otherwise inadmissible hearsay statement in a form that will be admissible at trial, *i.e.*, via substituted oral testimony by the third-party declarant." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 424 (6th Cir. 2021).

The standard for cross-motions for summary judgment "does not differ from the standard applied when a motion is filed by only one party to the litigation." *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009). Thus, when assessing cross-motions for summary judgment, the Court must still "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

### IV.    FTCA

The United States cannot be sued unless it waives its sovereign immunity. *United States v. Orleans*, 96 S. Ct. 1971, 1976 (1976). The FTCA, to a point, waives sovereign immunity and allows suits against the United States for personal injuries caused by governmental employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1). Under the FTCA, a plaintiff may recover a monetary award from the United States for injury, property loss, or death:

… caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

"The FTCA 'does not itself create a substantive cause of action against the United States; rather it provides a mechanism for bringing a state law tort action against the federal government in federal court.'" *Risch v. Kenton County*, No. 09-50-WOB-JGW, 2012 WL 3613278, at *3 (E.D. Ky. Aug. 22, 2012) (*quoting Lomandon v. United States*, 667 F.3d 363, 372 (3d Cir. 2011)). Accordingly, the United States may, as relevant here, only be held liable if the conduct complained of amounts to negligence in accordance with the law of the place where the conduct occurred. *Lyons v. Brandly*, 430 F. App'x 377, 381 (6th Cir. 2011) ("Liability under the Act is determined by reference to the law of the state where the alleged medical malpractice or negligence occurred."); *Friedman v. United States*, 927 F.2d 259, 261 (6th Cir. 1991); *Federal Deposit Ins. Corp. v. Meyer*, 114 S. Ct. 996, 1001 (1994) ("[W]e have consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State—the source of substantive liability under the FTCA."); *see also Rayonier, Inc. v. United States*, 77 S. Ct. 374, 376 (1957); *Huffman v. United States*, 82 F.3d 703, 705 (6th Cir. 1996). This rule extends to claims of medical malpractice. *See Vance v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996). Accordingly, in an FTCA action against the United States, the district court must apply the law of the state where the alleged negligent acts occurred, thus making Kentucky state tort law applicable to the present matter, centered at FMC Lexington.

In order to state a cause of action based on negligence under Kentucky law, a plaintiff must establish: "1) a duty on the part of the defendant; 2) a breach of that duty; and 3) a consequent injury." *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992). A plaintiff

alleging medical malpractice in Kentucky "must prove that the treatment given was below the degree of care and skill expected of a reasonably competent practitioner and that the negligence proximately caused injury or death." *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982).

Frazer's DE 32 motion seeking summary judgment in his favor on his FTCA claim must be denied for two reasons. First, Frazer expressly grounds his FTCA claim upon his allegation that the nurses repeatedly administered five units of insulin in disregard of the sliding scale prescription. *See* DE 26 at 10; DE 32 at 6, 11. However, the nurses counter that the MAR so indicating is incorrect, and that in each instance they administered a dose of insulin in conformity with the sliding scale. *See* DE 33 at 4. They have supported that assertion with evidence in the form of two sworn declarations. *See* DE 33-3 (Hobbs Decl.) at 3 ¶ 6; DE 33-4 (Miller Decl.) at 4 ¶ 6.[16] While Frazer contends that the nurses' statements are "absolutely preposterous," *see* DE 26 (*Bivens* motion) at 9, the Court is obligated to accept that evidence when evaluating Frazer's motion. *Gambrel v. Knox Cnty., Ky.*, 25 F.4th 391, 404 (6th Cir. 2022) ("Under the Supreme Court's summary-judgment rules, we must believe the nonmoving party's evidence at this stage, and disregard the moving party's conflicting evidence 'that the jury is not required to believe.'") (cleaned up) (*quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S. Ct. 2097, 2110 (2000)).

Further, in his motions, Frazer stridently asserts that the MAR must be an entirely accurate reflection of his healthcare history. But elsewhere he asserts just the opposite. In his FTCA complaint, he affirmatively states that numerous days are "missing" from the MAR. *See* DE 1 at 3-5. The MAR appears largely, although not entirely, complete with respect to its recitation of the

---

[16] The nurses' declarations may be considered when deciding the summary judgment motions. *See* FED. R. CIV. P. 56(a)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) … declarations …"); (c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

date, time, amount, and provider of insulin administration.  Missing, however, is any recorded blood glucose level for nearly half of the days from July 2022 through March 2023.  *See* DE 1-2 (MAR) at 3, 5-13, 15-20, 21-23, 27, 36.  Further, on several visits to the insulin line, the nurses recorded in the MAR that Frazer had refused to accept any insulin.  Frazer has handwritten on his provided copy of the MAR that he "DID NOT REFUSE" an insulin injection on a handful of the dates where the nurses recorded that he had.  *See* DE 1-2 at 12, 19.  The omissions and asserted inaccuracies of certain portions of the MAR noted by Frazer undermine his assertion that his medical records are conclusive evidence of dose of insulin the nurses administered on a given day.  Indeed, Frazer makes the point himself when responding to a different argument by the defendants.  *See* DE 40 at 3 ("The defendants have argued that the MAR is not correct but they try and cite it as correct here.  The defendants cannot have it both ways. The MAR is wrong here but right here is not a viable response.").  That point creates factual turbulence from both viewpoints.

Second, and critically, Frazer has not supported his claim of medical malpractice with expert testimony to establish breach of the standard of care, resulting injury, or proximate cause.  And the doctrine of *res ipsa loquitur* does not apply to excuse that omission.  To establish medical malpractice, Kentucky law requires a plaintiff to produce expert testimony showing both that a medical provider failed to conform to the applicable standard of care and that the failure to do so was the proximate cause of injury.  *Phillips v. Tangilag*, 14 F.4th 524, 540 (6th Cir. 2021) ("Unlike with other kinds of negligence claims, however, Kentucky courts generally require patients to introduce expert medical evidence to establish the breach and causation elements of this special negligence claim."); *Vance*, 90 F.3d at 1148; *Jarboe v. Harting*, 397 S.W.2d 775, 777 (Ky. Ct. App. 1965) ("[W]e recognize[] the rule that ordinarily expert evidence is necessary to support the conclusion of causation.").

The requirement that a plaintiff provide expert testimony stems from the highly technical and complicated nature of most medical malpractice cases. *See Baylis v. Lourdes Hosp. Inc.*, 805 S.W.2d 122, 124 (Ky. 1991) ("It is an accepted principle that in most medical negligence cases, proof of causation requires the testimony of an expert witness because the nature of the inquiry is such that jurors are not competent to draw their own conclusions from the evidence without the aid of such expert testimony.") (citation omitted); *Rose v. United States*, No. 09-104-ART, 2011 WL 839548, at *1 (E.D. Ky. Mar. 7, 2011) ("What is the right way to set a broken arm? How long should the cast stay on? Will the bone mend completely, or are some permanent deformities and range-of-motion limitations to be expected? … Kentucky courts do not trust juries to answer technical medical questions like these on their own. Instead, plaintiffs in medical malpractice cases must provide expert testimony establishing negligence and causation.").

Frazer has not supported his claims of medical malpractice with expert testimony. Instead, in both his original complaint and in his motion for summary judgment, he invokes *res ipsa loquitur*, an exception to the requirement. *See* DE 1 (Complaint) at 7-9; DE 32 (FTCA Motion) at 8-9. Under one form of this exception, "a patient does not need expert testimony about the standard of care if an ordinary person could conclude that a certain result would not happen if the doctor had performed with the proper skill." *Phillips*, 14 F.4th at 540 (*citing Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. 1992)).[17]

---

[17] Another form of the doctrine may apply where "the necessary expert testimony may consist of admissions by the defendant doctor." *Jarboe*, 397 S.W.2d at 778. In his dispositive motions, Frazer asserts that the defendants made such admissions in their responses to his discovery requests. *See* DE 26 at 7-9; DE 32 at 5-7. But the discovery responses include no such admissions: the defendant nurses did not admit that the doses recorded in the MAR were accurate, that they deviated from the standard of care, or that any such deviation proximately caused any injury to Frazer. Rather, the nurses stated that the MAR was accurate only to the extent that it indicates that they administered an insulin dose in accordance with the sliding scale prescription. *See* DE 34 (Response) at 4-5. This is therefore not a case "where the defendant physician makes certain admissions that make his negligence apparent." *Blankenship v. Collier*, 302 S.W.3d 665, 670 (Ky. 2010). MAR accuracy is a disputed and nuanced fact question.

However, the exception applies only rarely, *see id.* at 535 ("[T]he overwhelming weight of authority supports the view that ordinarily expert evidence is essential to support an action for malpractice against a physician or surgeon.") (citation omitted), and even then is limited to unique circumstances, *see id.* at 540 ("Think of a surgeon who leaves a scalpel blade in a patient's body.") (citing *City of Somerset v. Hart*, 549 S.W.2d 814, 817 (Ky. 1977)); *see also Perkins*, 828 S.W.2d at 655 (noting that prior instances where use of the doctrine was permitted involved leaving a foreign object in a patient's body during surgery or causing injury to a patient at a situs removed from where medical care was being provided).

*Res ipsa loquitur* cannot properly be invoked to establish injury or proximate cause under these facts. As pointed out by the United States, this Court faced a similar context in *Moler v. United States*, No. 6:19-CV-00204-CHB-MAS, 2022 WL 22822832, (E.D. Ky. Feb. 14, 2022), *report and recommendation adopted*, 2022 WL 22822648 (E.D. Ky. Mar. 3, 2022). The *Moler* Court succinctly stated:

> Nor is the sort of care surrounding diabetes management, insofar as it relates to insulin dosage timing and specific nutrition or dental requirements, inherently discernible to a lay juror without the aid of expert proof. Though lay jurors may have a general understanding of the sort of nutritional requirements associated with diabetes management, they are far less likely to understand as a matter of common knowledge the medical care aspects of such and a physician's or dentist's appropriate role in recommending and managing specific treatment (including nutrition and/or dental accommodations, etc.). And understanding the proper timing of insulin doses for a patient in Moler's position surely requires context from medical sources, as does understanding the standard for prescribing mental health medication. Some sort of expert proof of the applicable medical standard of care is thus required in this case for each claim.

2022 WL 22822832 at *6. The Court further held that expert testimony was required not only to establish the standard of care but to demonstrate proximate causation:

> … each of Moler's claims decidedly fails for lack of expert proof as to proximate causation. … Unlike the illustrative examples of a dentist's drill slipping and puncturing a patient's tongue, or a surgeon leaving a foreign object in a patient after

19

> surgery or removing the incorrect body part during an amputation, this case is not one in which a factfinder "may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it." [*Ashland Hosp. Corp. v. Lewis*, 581 S.W.3d 572, 578 (Ky. 2019)]. … The development of both chronic kidney disease and erectile dysfunction/priapism are complex medical processes that are triggered, exacerbated, and impacted by a wide variety of medical factors, and all far outside of the lay factfinder's scope of knowledge. The role of the BOP's care in Moler's development of these issues, if any, cannot be inferred from the existence of the conditions alone; res ipsa loquitur thus does not apply here.

*Id.* at *7 (cleaned up) (citations omitted).

The same factors are at play in this case. As noted above, Frazer's extensive medical history began in his childhood, and he suffers from a laundry list of ailments requiring treatment through more than two dozen medications administered at varying doses, times, and frequencies. *See* DE 33-1 at 2 (Progress Notes); DE 33-5 (Fitzgerald Report) at 3-4; DE 33-1 at 4-6 (Current Outpatient Medications). Frazer was routinely noncompliant with his insulin prescription: he admits that he never ate breakfast and declined to take insulin in the morning; he does not contest that he frequently failed to show up for the afternoon or evening insulin line, or that he often refused insulin when he did show up despite elevated blood glucose levels. *See* DE 33-2 at 27-28; DE 1-2 at 2-37. Frazer also suffers from pancreatic diabetes. Dr. Fitzgerald notes that this is a type of diabetes that renders controlling Frazer's blood glucose levels even more challenging.[18] And Frazer acknowledged in his deposition that some of his symptoms are indistinguishable from those experienced through the steady progression of diabetes. *See* DE 33-2 at 43-44.

---

[18] *See* DE 33-5 at 5 ("In diabetics, the sort of fine-tuning described above is impossible. Patients with pancreatic diabetes have even more difficulty, since the intestinal absorption of carbohydrates is more variable, since digestive enzymes taken as oral capsules are much less efficient than natural pancreatic enzymes, such that the absorption of glucose from an exact same meal will vary considerably. This is very problematic for patients with pancreatic diabetes, since the same dose of regular insulin may be insufficient for one meal and then excessive for the next meal, causing hypoglycemia.").

Independent of the medical complexity of managing diabetes on its own, the presence of a myriad of other medical conditions and contributing factors necessitates expert testimony to guide lay decisionmakers in assessing whether Frazer suffered medical harm proximately caused by the defendant nurses' alleged negligence. *Cf. Fryman v. Wiczkowski*, No. 2011-CA-001042-MR, 2012 WL 6061727, at *4 (Ky. Ct. App. Dec. 7, 2012) (holding the doctrine inapplicable; "This is especially true in light of Fryman's complex medical posture, which included a prior MRSA infection, back surgery, sepsis, diabetes, and a substance abuse problem."); *see also Nichols ex rel. Hamilton v. Greater Se. Cmty. Hosp.*, 382 F. Supp. 2d 109, 115 (D.D.C. 2005) (declining to apply doctrine where the cause of death "is well beyond the pale of 'common knowledge or experience' of a layperson" in light of numerous health conditions suffered by the decedent); *Saldana v. United States*, No. 3:16-CV-634, 2018 WL 1385211, at *17 (M.D. Pa. Mar. 19, 2018) (concluding that laypersons would require the assistance of expert opinion testimony to determine whether prisoner's symptoms were proximately caused by healthcare provider's negligence or were the consequence of long uncontrolled diabetes).

Because Kentucky law requires Frazer's claims of medical malpractice to be supported by expert testimony and he does not provide it, the Court must deny his motion for summary judgment. That omission further establishes that the United States's motion for summary judgment must be granted with respect to Frazer's FTCA claims. *See Phillips*, 14 F. 4th at 540 ("Lay jurors typically cannot answer medical questions about whether a defendant adhered to the healthcare community's standard of care or scientific questions about whether the failure to live up to that standard caused any injuries.") (cleaned up). Though this might be a closer call just on the issue of breach (given that, under one set of facts the nurses would have serially failed to comply with a prescription put in place by a physician), the harm and causal questions plainly and

21

inarguably require expertise. The absence of expert proof dooms Frazer's claim and requires judgment for the United States.

## V.    *Bivens*

The Eighth Amendment protects individuals from infliction of cruel and unusual punishments. *See* U.S. Const. Amend. XIII. The Amendment requires prison officials to provide inmates with basic human needs, including medical care and shelter. *See Farmer v. Brennan*, 114 S. Ct. 1970, 1976 (1994). With respect to the provision of medical care, a prisoner may state a viable claim that the Amendment's protections have been offended by alleging "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Estelle v. Gamble*, 97 S. Ct. 285, 292 (1976).

The Eighth Amendment's text does not address how severe such a failure must be to constitute "cruel and unusual" punishment; so, the Supreme Court has filled the gaps. Its cases have long held that a prison official must have a "sufficiently culpable state of mind" that rises to the level of "deliberate indifference to inmate health or safety" to violate the Eighth Amendment. *Farmer*, 114 S. Ct. at 1977 (citing *Wilson v. Seiter*, 111 S. Ct. 2321, 2326 (1991)). In *Estelle v. Gamble*, 97 S. Ct. 285, 291 (1976), the highest court held that deliberate indifference to an inmate's medical needs requires something more than "negligence in diagnosing or treating a medical condition." *Id.* at 292. Instead, it describes a subjective state of mind evincing "obduracy and wantonness" to an inmate's serious medical needs rather than "inadvertence or error in good faith." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (citing *Wilson*, 111 S. Ct. at 2324). Deliberate indifference falls generally between negligence and purposeful or knowing harm. *See Farmer*, 114 S. Ct. at 1978. The Courts of Appeals, so says the Supreme Court, coalesced around something

22

akin to criminal recklessness: the conscious disregard of a substantial and unjustifiable risk of harm. *See id.* at 1979–80 (collecting cases and applying the criminal recklessness standard to deliberate indifference claims).

Deliberate indifference claims concerning an inmate's medical needs turn on an objective and subjective component. *See Rhinehart*, 894 F.3d at 737. The inmate must show that the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and that the official acted with a culpable state of mind, rising above gross negligence. *See id.* (citing *Farmer*, 114 S. Ct. at 1970).

As for the objective component, the inmate must show a sufficiently serious deprivation of medical care to constitute cruel and unusual punishment. *Farmer*, 114 S. Ct. at 1977 (noting that a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities"). The bar can be met by prison's staff's complete omission (*e.g.*, of care for a "serious medical need" that was "diagnosed by a physician as mandating treatment") or by demonstrating the inadequacy of its commission. *See Rhinehart*, 894 F.3d at 737; *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) ("[W]e distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."). However, showing deliberate indifference during the treatment stage is more stringent. *See Rhinehart*, 894 F.3d at 737. In a setting where the inmate has received on-going treatment, but claims that the treatment was inadequate, an objective showing of deliberate indifference requires care "so grossly incompetent, inadequate, or excessive as to the shock the conscience or to be intolerable to fundamental fairness." *Id.* (quoting *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005)).

The latter species of deliberate indifference claim—an adequacy-of-care claim, as generally understood—normally requires special proof on the objective component.  Because "a disagreement with a course of medical treatment" does not amount to deliberate indifference, *see Rhinehart*, 894 F.3d at 744, the inmate must provide "medical proof that the provided treatment was not adequate," which often demands expert medical testimony demonstrating "the medical necessity for the [withheld] treatment and the inadequacy of the treatments" the inmate received. *Id.* at 737–38 (quoting *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017)) (internal quotations omitted); *see also Phillips*, 14 F.4th at 535 (squaring the medical-evidence requirement in an adequacy-of-care claim with the standard practice that a plaintiff in a medical malpractice tort claim must normally provide medical evidence to establish a triable claim against a physician or surgeon).  An inmate also must "place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment. *Rhinehart*, 894 F.3d at 738.

If an inmate demonstrates a triable issue of fact on the objective component, only then does the subjective component have a part to play.  *See Phillips*, 14 F.4th at 535.  The subjective component asks whether an official knew of and consciously disregarded a serious medical need. *See id.*  Accidental harms do not inflict "punishment" within the meaning of the Eighth Amendment. *See id.* (quoting *Wilson*, 111 S. Ct. at 2321).  So, the relevant official must  know of the facts that show the serious medical need, must personally conclude that the need exists, and finally, must "consciously disregard" such need.  *Phillips*, 14 F.4th at 535; *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010).

Frazer's DE 26 motion seeking summary judgment in his favor on the *Bivens* claim is again premised upon the notion that information contained within the MAR is incontrovertible.  *See* DE 26 at 7-10.  However, the nurses contest the accuracy of the dose information recorded in the MAR

24

in their declarations. *See* DE 33-3 at 3 ¶ 6; DE 33-4 at 4 ¶ 6. Because those opposing factual allegations must be credited in this procedural posture, *Gambrel*, 25 F.4th at 404, a genuine issue of material fact exists regarding the amount of insulin the nurses actually administered to Frazer during the time frame in question. Frazer's motion seeking favorable summary resolution of his *Bivens* claims must therefore be denied. The specific nurse averments along with questions about the MAR accuracy and auto-population protocol foreclose a finding as a matter of law on the medication history.

The defendant nurses put forth a variety of arguments in their motion for summary judgment. *See* DE 33. Among these arguments is the contention that the Court's grant of summary judgment on Frazer's FTCA claim implicates the FTCA's judgment bar. *See id*. at 11-12. The pertinent provision states that:

> The judgment in an action under section 1346(b) of this title shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim.

28 U.S.C. § 2676; *see also United States v. Gilman*, 74 S. Ct. 695, 696 (1954) ("The Tort Claims Act does not touch the liability of the employees except in one respect: by 28 U.S.C. § 2676 it makes the judgment against the United States 'a complete bar' to any action by the claimant against the employee."). Frazer offers no response to this argument. *See* DE 40.

The judgment bar does not apply to dismissal of a FTCA claim for lack of subject matter jurisdiction. *See Himmelreich v. Fed. Bureau of Prisons*, 766 F.3d 576, 579 (6th Cir. 2014), *aff'd and remanded sub nom. Simmons v. Himmelreich*, 136 S. Ct. 1843 (2016). However, it does apply to a judgment on the merits of the FTCA claim. *See Brownback v. King*, 141 S. Ct. 740, 748 (2021). And it applies where "the plaintiff simultaneously filed *Bivens* and FTCA claims against the United States and government officials." *See Himmelreich*, 766 F.3d at 579 (*citing Harris v.*

25

*United States*, 422 F.3d 322, 334 (6th Cir. 2005) ("In accordance with the consistent application of the judgment bar over the fifty years since its enactment, we have held that the provision applies even when 'the claims were tried together in the same suit and [] the judgments were entered simultaneously.'"); *see also Manning v. United States*, 546 F.3d 430, 433 (7th Cir. 2008) (rejecting arguments that Section 2676 "should not apply to claims raised in the same action, and, alternatively, that the judgment bar should not apply retroactively to nullify a previous *Bivens* judgment"); *Aetna Cas. & Sur. Co. v. United States*, 570 F.2d 1197, 1201 (4th Cir. 1978) ("[A] judgment against the United States would automatically bar the entry of any contemporaneous or subsequent judgment against [the government employees].").

Because the Court has concluded that the government is entitled to summary judgment, as a matter of the merits, on Frazer's FTCA claim and will enter judgment accordingly, Frazer's *Bivens* claim arising from the same series of transactions and occurrences and against the same precipitating employees is barred by Section 2676. The Court will therefore grant the defendants' motion and enter judgment accordingly. [19]

Accordingly, the Court **ORDERS** as follows:

1. The Court **DENIES** Frazer's DE 26 (Motion for Summary Judgment).

2. The Court **DENIES** Frazer's DE 32 (Motion for Summary Judgment).

3. The Court **GRANTS** the Defendants' DE 33 (Defendants' Motion for Summary Judgment).

4. The Court will enter Judgment accordingly and separately in the underlying cases.

---

[19] In light of this disposition, the Court need not and does not address their alternative grounds for summary judgment. *See* DE 33 at 10-12. That said, the requirement of expert proof, as referenced in *Phillips v. Tangilag*, surely also would apply to any damage theory under the Eighth Amendment. That missing proof would likewise thwart the *Bivens* claim.

5. The Court **STRIKES** this matter from the docket.

This the 26th day of January, 2026.



Signed By:

*Robert E. Wier*

**United States District Judge**